# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 15-381V
Filed: August 15, 2024

| | |
|---|---|
| MAJED EILAN and SHAMS EILAN parents and next friends of A.E., a minor, | Special Master Horner |
| Petitioner, | |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Richard Gage, Richard Gage, P.C., Cheyenne, WY, for petitioners.*
*Emilie Williams, U.S. Department of Justice, Washington, DC, for respondent.*

## RULING ON DAMAGES[1]

On April 15, 2015, petitioners filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that haemophilus influenza type B ("Hib"), measles mumps and rubella ("MMR"), pneumococcal, and varicella vaccines, that their daughter, A.E., received on April 27, 2012, caused her to suffer acute disseminated encephalomyelitis ("ADEM"). (ECF No. 1.) On February 23, 2021, petitioners were found entitled to compensation. (ECF No. 106; *see also* 2021 WL 1085925). However, the parties have been unable to resolve damages informally, necessitating this ruling that will resolve certain issues between the parties to facilitate a decision awarding damages.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

1

I.      **Factual and Procedural History**

A.E.'s vaccine injury occurred when she was about one-year old.  She is now about thirteen years old.  Pertinent to this ruling, the parties agree that A.E. suffers significant, lifelong physical disability and therefore will never live without attendant care and is unlikely to ever work during her life.  However, she is not cognitively impaired.  Currently, she is an A and B-plus student, albeit with an Individualized Education Program ("IEP") for her physical disabilities that anticipates she will not complete her schooling at the same pace as her peers.  Apart from the discrete issues discussed below, the parties agree overall regarding the nature and extent of the care A.E. will need.  The parties also have differences on the calculation of A.E.'s loss of earnings; however, these differences do not turn on the details of A.E.'s own history.  Accordingly, a detailed review of A.E.'s medical history is not necessary.

Following the ruling on entitlement, the parties attempted to resolve damages informally over a period of about two years before it ultimately became apparent they would be unable to reach an agreement.  Petitioners filed three reports from economist Mark McNulty, Ph.D. (Exs. 70, 79, 85),[3] and respondent responded with an opinion by economist Patrick Kennedy, Ph.D. (Exs. D, O).[4]  Additionally, petitioners presented a life care plan prepared by Elizabeth Kattman (Exs. 68, 78, 81),[5] and respondent filed a

---

[3] Dr. McNulty received his bachelor's degree in economics and mathematics from the University of South Dakota in 1978, before going on to complete his Ph.D. in economics and statistics at Iowa State University in 1985.  (Ex. 71, p. 1; Tr. 7.)  He is a member of the American Economic Association, as well as the American Statistical Association.  (Ex. 71, p. 2.)  Dr. McNulty currently conducts economic and statistical analysis for Economic Solutions, LLC, in Wyoming.  (*Id.* at 1.)  Prior to that, Dr. McNulty was on the faculty in the statistics and economics departments at Kansas State University.  (*Id.* at 2; Tr. 7-8.)  He has also worked at consulting firms where he primarily focused on conducting forensic economic analyses and labor studies.  (Ex. 71, pp. 1-2; Tr. 8-9.)  He also has substantial applied experience and teaching experience in stochastic process.  (Tr. 9-10.)  Dr. McNulty was proffered at the hearing as an expert in economics and statistics without objection.  (*Id.* at 10.)

[4] Dr. Kennedy received his bachelor's degree in economics from the University of California, San Diego, in 1986, before going on to complete his Ph.D. in economics at Stanford University in 1992.  (Ex. L, p. 1; Tr. 54.)  Thereafter, Dr. Kennedy worked as an economist at the Board of Governors of the Federal Reserve System in Washington, D.C, and then as the director of economic research at the International Securities Group, Inc.  (Ex. L, p. 1; Tr. 54-55.)  From there, Dr. Kennedy began serving in an economic loss capacity in 1996.  (Tr. 55-56.)  Dr. Kennedy maintains a broad practice that includes consultation regarding, among other things, personal loss, commercial loss, and intellectual property.  (*Id.* at 55.)  He was proffered at the hearing as an expert in economics without objection.  (*Id.* at 56.)

[5] Ms. Kattman received her bachelor's degree in human rehabilitation services and gerontology from the University of North Colorado in 1993, before going on to receive her master's degree in special education with an emphasis in rehabilitation counseling from Utah State University in 1999.  (Ex. 69, p. 1; Tr. 101.)  She is a certified life care planner, rehabilitation counselor, and case manager.  (Ex. 69, p. 1; Tr. 101-02.)  Since graduating with her bachelor's degree, Ms. Kattman has worked as a rehabilitation counselor and life care planner at ReEntry Rehabilitation Services, Inc., in Colorado.  (Ex. 69, p. .1; Tr. 101-03.)  In that capacity, she counsels individuals with disabilities with regards to specified goals and provides opinions regarding loss of earning capacity and ability to work and earn wages.  (Tr. 102.)  Ms. Kattman was proffered at the hearing as an expert life care planner without objection.  (*Id.* at 103.)

responsive life care plan prepared by Ginger Walton (Ex. E).[6]  A damages hearing was held on November 15, 2023.  (*See* ECF No. 174 ("Tr.").)  Ms. Eilan testified at the hearing, along with each party's economist and life care planner.

During the hearing, the life care planners discussed having received conflicting information when they separately contacted Good Shepherd Rehabilitation Hospital with respect to out-of-pocket rates for various therapies.  I therefore directed the life care planners to hold a joint call with the facility to discuss the rates, which they did on December 11, 2023.  Petitioners filed a memorandum prepared by Ms. Kattman and signed by the representatives of Good Shepherd, memorializing the conversation.  (ECF No. 177-1; Ex. 86.)  Along with the memorandum, petitioners filed a consensus statement for life care planning published in the Journal of Life Care Planning in 2018.  (ECF No. 177-2; Ex. 87.)

In directing the parties to file post-hearing briefs, I advised that "I anticipate issuing a ruling with respect to the specific issues addressed in the post-hearing briefs, as opposed to a decision awarding damages.  Therefore, the parties will have an additional opportunity to calculate an award of damages based on the details of my ruling and to discuss the form of the award."  (ECF No. 173.)  Petitioners filed a post-hearing brief on March 11, 2024.  (ECF No. 178.)  Respondent filed his response on April 18, 2024.  (ECF No. 180.)  Petitioners filed their reply on May 3, 2024.  (ECF No. 181.)  Accordingly, the issues presented by the party briefs are now ripe for resolution.

## II.    Issues to Be Decided

As noted above, this ruling will not reach a conclusion with respect to the overall amount of damages in this case.  Instead, the parties have presented a number of specific questions in need of resolution by the undersigned.  After resolution of these issues, the parties should have sufficient information to determine the form of petitioners' award and to complete further necessary calculations to arrive at the amount of the award.

Regarding petitioners' claim for A.E.'s loss of earnings, the parties present the following questions:

(1) What anticipated retirement age should be used to calculate A.E.'s loss of earnings?

---

[6] Ms. Walton received her bachelor's degree in nursing from the University of North Caroline at Chapel Hill in 1981, before going on to receive her master's degree in nursing with family nurse practitioner certificate and to complete a Leadership Education in Neurodevelopment and Related Disabilities fellowship from the same university in 1986 and 2014, respectively.  (Ex. M, p. 1; Tr. 139-40.)  She has been a registered nurse since 1981 and a certified nurse life care planner since 2004.  (Ex. M, p. 1; Tr. 140.)  In her early career, Ms. Walton worked in a general family and pediatric practice.  (Ex. M, p. 2; Tr. 140.)  She went on to specialize in outpatient care for children and young adults with physical, intellectual, and developmental disabilities for about a decade before transitioning to nonprofit work for people with disabilities.  (Ex. M, pp. 1-2; Tr. 140.)  She was proffered at the hearing as an expert nurse life care planner without objection.  (Tr. 141.)

(2) For purposes of calculating loss of earnings, how should A.E.'s "work-life expectancy" be determined?

(3) Should a calculation of loss of earnings for a minor under the Vaccine Act include deferred retirement income from retirement benefits and social security?

With regard to the parties' competing life care plans for A.E., the parties present the following additional questions:

(1) Should A.E. receive funds for adaptive recreation (*e.g.*, summer camp) and, if so, should the funds received for attendant care be reduced for any period A.E. is expected to be in some other form of daily care?

(2) Which party's life care planner's assessment of the cost of certified nurse aid ("CNA") care should be utilized?

(3) The parties agree that the program will fund private health insurance for A.E. through age 21; however, the parties also agree that A.E. will require physical, occupational, and speech therapies in excess of what the agreed-upon insurance plan will cover, necessitating out-of-pocket payment for the remaining therapy sessions. How much should petitioners be awarded to cover the additional therapy?

(4) Should A.E. receive funds for tutoring?

(5) Should the award for A.E.'s future care assume that A.E. will enter a residential care facility at the age of 60?

### III.   Analysis

Petitioners who have been found entitled to compensation under the Vaccine Act may recover as appropriate for (1) actual and projected pain, suffering and emotional distress, (2) actual and/or projected unreimbursable expenses, and (3) actual and/or anticipated loss of earnings. § 300aa-15(a). Only the latter two aspects of A.E.'s overall damages are at issue in this ruling. The petitioners bear the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

#### a.   Loss of Earnings

A.E.'s award for loss of earnings is governed by Section 15(a)(3)(B) of the Vaccine Act, which awards loss of earnings for minors as follows:

4

compensation after attaining the age of 18 for loss of earnings determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector, less appropriate taxes and the average cost of a health insurance policy, as determined by the Secretary.

§ 300aa-15(a)(3)(B).

Although not explicit in the text, special masters have long understood that calculation of an award under this statutory language requires that some determinations be made by the special master. *Childers v. Sec'y of Health & Human Servs.*, No. 96-194V, 1999 WL 218893, at *1 (Fed. Cl. Spec. Mstr. Mar. 26, 1999). In particular, special masters must determine what factors are encompassed in determining the base figure for calculation, as well as the duration over which the loss of earnings is anticipated. *Id.* The three issues raised by the parties relative to A.E.'s loss of earnings touch on these points.

(1) <u>Retirement age</u>

Petitioners contend, based on the opinion of Dr. McNulty, that 66 is an appropriate anticipated retirement age from which to calculate A.E.'s loss of earnings. (ECF No. 178, p. 4 (citing Ex. 79, pp. 2-4; Tr. 10).) Dr. McNulty testified that age 65 is the median retirement age – *i.e.*, the age at which half the population is in the workforce and half the population is out of the workforce – *today*. (Tr. 12.) However, Dr. McNulty opines that there is a trend toward people working longer. He cites Bureau of Labor Statistics ("BLS") data (Ex. 79, attachment 11), which he indicates suggests a 1.2 percent growth rate for labor force participation among older workers over the next ten years. (*Id.*) Therefore, he opines that it is reasonable to add one year to today's the median age of retirement, given that A.E.'s hypothetical retirement is decades away. (*Id.* at 12-13.) On respondent's behalf, Dr. Kennedy applies a retirement age of 65.05. (Ex. O, p. 13.) He challenges Dr. McNulty's reliance on projected labor force participation rates to add an additional year to the expected retirement age. (*Id.*)

I am not persuaded that Dr. McNulty's expected retirement age of 66 was reliably reached. As observed by Dr. Kennedy, although Dr. McNulty cites BLS trend data projecting increased labor force participation among older individuals, the resulting 2030 projection still shows that less than half (39.6%) of individuals aged 65-69 will remain in the workforce at that age. (Ex. 79, attachment 11.2 tbl.1; Ex. O, p. 13.) Thus, this does not in itself suggest that the projected trend observed by BLS will change the median retirement age that Dr. McNulty otherwise relies upon. The BLS attributes the trend it has observed at least in part to changes affecting social security and private pensions (Ex. 79, attachment 11.2), which suggests that while retirement patterns may fluctuate based on the availability of retirement benefits, it is still expected that overall retirement activity is tethered to such benefits. That does not readily suggest an unceasing trend toward ever-increasing age of median retirement, and Dr. McNulty has not offered an explanation that would support a continuation of the trend beyond the 2030 projection. Setting aside Dr. McNulty's one-year extension, both experts otherwise agree that

5

current data supports an expected retirement age of 65. (Ex. 79, pp. 2-4; Ex. O, pp. 12-13.)

Accordingly, for purposes of calculating A.E.'s loss of earnings, the parties shall assume that A.E. is expected to retire at age 65.05 as assumed by Dr. Kennedy.

(2) <u>Work-life expectancy</u>

Although A.E.'s overall time in the workforce would have been the approximately 47 years from age 18 to 65, both parties' economists agree in principle that most workers experience at least some separation from the workforce during their working life. This "work-life expectancy" has traditionally been factored into loss of earnings awards under Section 15(a)(3)(B). *Childers*, 1999 WL 218893, at *16-17. However, in accounting for this reality, the economists apply different methodologies. Each party argues that the other party's economist has applied an unreliable methodology.

Dr. McNulty cites 4.2% as being the average of the unemployment rates cited by the Congressional Budget Office and the Economic Report of the President, respectively. (Ex. 79, p. 5.) Therefore, he assumes that, at any given time, there would be a 4.2% chance that A.E. would be unemployed. (Tr. 14-15.) He uses this as a proxy for reducing A.E.'s work-life to account for periods she may be out of the workforce. (*Id.*) He explains that this amounts to reducing A.E.'s work-life by about two weeks per year. (*Id.* at 10.) Thus, he effectively concludes that A.E.'s loss of earnings should assume that she would have worked a total of 45.24 years.[7]

Dr. Kennedy explains, however, that "U.S. workers' labor market experience is characterized by voluntary and involuntary separations from the labor force, including mortality, in the period leading up to retirement. Failing to account for separations from the workforce that occur prior to retirement results in an overstatement of [A.E.]'s loss of earning." (Ex. O, p. 10 (internal footnote omitted).) Although Dr. McNulty does account for possible periods of unemployment, unemployment specifically tracks workers who are *actively* seeking employment. Accordingly, Dr. Kennedy persuasively notes that Dr. McNulty accounts for only a fraction of workforce separations. (Ex. O, p. 11; Tr. 66-67, 81-82.) Thus, while effectively acknowledging the need to adjust for work-life expectancy, Dr. McNulty underestimates absence from the workforce in a fundamental way.

Dr. Kennedy, by contrast, uses something called the Markov model. (Ex. O, p. 11.) The Markov model is a mathematical model that seeks to track movement in and out of the workforce. (*Id.*) According to Dr. Kennedy, use of the Markov model to estimate work-life expectancy is both reliable and generally accepted among forensic

---

[7] In reality, Dr. McNulty accounts for this 4.2% reduction after otherwise calculating a dollar amount for an uninterrupted work-life from age 18 through retirement. (Ex. 79, p. 5.) I have converted this to a period of years to provide an apples-to-apples comparison. Based on the retirement age as I have found it, A.E. would be expected to be in the workforce for an overall period of 47.05 years (65.05-18). Dr. McNulty estimates he is reducing her worktime by about two weeks per year, which is a total of 94.1 weeks over the course of that 47.05 years, for a total 1.81 years.

6

accountants.  (*Id.*)  Using that model, he determines A.E.'s work-life expectancy to be 38 years.  (*Id.* at 12.)  Dr. McNulty does not dispute that the Markov model produces a work-life expectancy of 38 years, but has criticisms of the reliability of the Markov model itself.  Yet, on a fundamental level he agrees that "the essence of the Markov model is that it tries to track people as they move in and out of the labor force and tries to measure how long people are in the labor force and how long they are out."  (Tr. 16.)  He agreed, of the Markov model, "that basic idea is correct."  (*Id.*)

Dr. McNulty's criticism is that the Markov model is, in effect, too simplistic.  No data set is available that tracks a cohort's actual movement in and out of the workforce over a lifetime, so the Markov model makes assumptions about behavior based on data from more limited periods.  (Tr. 16-17.)  The core criticism Dr. McNulty offers is that this model treats people a-historically.  (*Id.* at 18-20.)  That is, the Markov assumption treats the probability of whether a person will be in the workforce in the future based on their status in the prior year, irrespective of their actual historical employment pattern.  (*Id.* at 19-20.)  According to Dr. McNulty, this results in an underestimating of work-life among the employed.  (*Id.* at 24 (discussing Ex. 85, attachment 4 (Ippei Shibata, *Labor Market Dynamics: A Hidden Markov Approach* (Int'l Monetary Fund, Working Paper, WP/19/282, 2019)).).  However, upon my further questioning, Dr. McNulty also agreed that the model would conversely underpredict the amount of time that more marginal workers would remain out of the workforce.  (*Id.*)  Ultimately, Dr. McNulty was not able to definitively say that the Markov model results in any underestimate on the whole, instead suggesting that the issue may be mathematically unanswerable. (*Id.* at 25-26.)  Thus, Dr. Kennedy persuasively countered that the criticism of the Markov model raised by Dr. McNulty (and reflected in the paper by Shibata) does not "fatally wound" the use of the statistical model.  (*Id.* at 72-73.)

In the context of assessing loss of earnings for an adult, I may be more inclined to explore Dr. McNulty's criticisms of the Markov model further.  However, for purposes of assessing a minor vaccinee's loss of earnings based on the average worker and no personal work history, I am persuaded that Dr. Kennedy has established the Markov model as a reliable and generally accepted methodology.  A passage from one of the papers cited by Dr. McNulty is instructive.  In answer to the prompt "Is the Markov process realistic for calculating work life expectancy," they answered in pertinent part: "If the purpose of the table is to summarize the average behavior of an entire cohort, the Markov assumption seems perfectly appropriate.  However it may not be if the purpose of the table is to forecast the behavior of a particular individual."  (Ex. 85, attachment 5 (Edward M. Foster & Gary R. Skoog, *The Markov Assumption for Worklife Expectancy*, 17 J. FORENSIC ECONS. 167 (2004)).)  Dr. McNulty testified that he disagrees with that statement because "you can't say that an assumption is wrong but then on average it's okay."  (Tr. 47.)  However, that is not how I interpret this conclusion from Foster and Skoog.  Rather than concluding the assumption is wrong, I understand these authors to be saying that the Markov assumption may be useful in one context, but not another.  And the context in which they agree the assumption is appropriate is consistent with the approach for determining loss of earnings for a minor under this statute.  In any event, for all of his criticism of the Markov model, Dr. McNulty has not explained how his

extrapolation from the unemployment rate answers any of his concerns regarding accuracy, especially given that it fundamentally fails to capture all types of workforce separation.

On this record, and for purposes of assessing anticipated loss of earnings for a minor with no work history, I find that the Markov model presented by Dr. Kennedy is appropriate to apply and is the more reliable methodology as between the competing methodologies that have been presented. Accordingly, for purposes of calculating A.E.'s lost earnings, the parties shall assume that A.E. is expected to work a total of 38 years between the ages of 18 and 65 as assumed by Dr. Kennedy.

(3) Social security and retirement benefits

Petitioners argue that the meaning of "loss of earnings" under Section 15(a)(3)(B) of the Vaccine Act should align with the general understanding of the concept in the broader tort arena. (ECF No. 178, p. 13.) Citing Black's Law Dictionary, petitioners contend that the term "lost earnings" means "[w]ages, salary, or other income that a person could have earned if he or she had not lost a job, suffered a disability injury, or died." (*Id.* at 12-13 (alteration in original).) Citing the Consumer Credit Protection Act, petitioners further suggest that the term "earnings" also more specifically includes "periodic payments pursuant to a pension or retirement program." (*Id.* at 13 (quoting 15 U.S.C. § 1672).) They argue that Social Security retirement is not a "benefit," but rather deferred income. (*Id.*) In that regard, petitioners stress that the IRS taxes Social Security payments as income. (*Id.* at 14.)

Respondent offers two arguments in response. First, he stresses that the statutorily prescribed formula "does not include future Social Security retirement benefits or numerous other types of earnings that might be considered in other contexts, such as pensions, 401k contributions, stock options, and other fringe benefits."[8] (ECF No. 180, p. 10.) Second, he argues that petitioners have not demonstrated that A.E. has suffered a loss of Social Security benefits, because "A.E. will be eligible [for] cash benefits from the Social Security Administration as a Disabled Adult Child of her father in 2033, which is two years after he reaches full retirement age. Then, in 2076, when A.E. turns 67, her benefits will convert to SS retirement benefits, based on her own eligibility." (ECF No. 180, p. 11 (internal citation omitted).)

---

[8] The quoted language is the full extent of respondent's argument on this point. Although not explicitly stated, this appears implicitly to invoke a narrow reading of the statute as required when interpreting a waiver of sovereign immunity. I am mindful that prior program cases have held that, despite the Vaccine Act constituting a remedial program, this provision of the Act must be construed narrowly as a waiver of sovereign immunity. *Childers*, 1999 WL 218893, at *2-12. In *Childers*, the special master concluded that, if two or more possible interpretations of the statue are of "equal likelihood," then the more limited interpretation must be applied. *Id.* at *12. Here, for all the reasons discussed throughout, I conclude that petitioners' interpretation of the statutory language is more likely as it pertains specifically to Social Security retirement income.

8

Although the term "earnings" is not defined within the Vaccine Act, interpretation of Section 15(a)(3)(A) for loss of earnings among adults has begun with the premise that earnings are "[r]evenue gained from labor or services, from the investment of capital, or from assets." *Heinzelman v. Sec'y of Health & Human Servs.*, 98 Fed. Cl. 808, 816 (2011) (alteration in original) (quoting BLACK'S LAW DICTIONARY 548 (9th ed. 2009)), *aff'd*, 681 F.3d 1374 (Fed. Cir. 2012). From that premise, petitioners' rationale was very recently accepted by another special master in determining an award for loss of earnings for an adult petitioner under Section 15(a)(3)(A). *Bryan v. Sec'y of Health & Human Servs.*, No. 14-898V, 2024 WL 3797739 (Fed. Cl. Spec. Mstr. July 15, 2024). The *Bryan* special master concluded that Social Security retirement income is a form of "earnings" for purposes of a loss of earnings claim under the Vaccine Act, explaining that "Social Security retirement income is paid to members during retirement years based on their work history, contributions, and retirement age. It is revenue gained from labor. Further, it is subject to federal income tax, depending on the income level of the recipient." *Id*. at *16 (footnote omitted); *see also Gross v. Sec' of Health & Human Servs.*, 154 Fed. Cl. 109 112 (2021) (finding it was not an abuse of discretion for the special master to conclude that use of a paid time off (PTO), identified as an employment benefit, constituted a loss of earnings under the statute even though the evidence did not "definitively show that petitioner's unused PTO would be paid out"). *But see Watkins v. Sec'y of Health & Human Servs.*, No. 95-154V, 1999 WL 199057, at *3 (Fed Cl. Spec. Mstr. Mar. 12, 1999) (expressing doubt that the term "weekly earnings," as used in Section 15(a)(3)(B), includes Social Security).

For awards of loss of earnings for minors, the Federal Circuit has already specifically held that the FICA taxes that determine Social Security retirement income are "appropriate taxes" under the statutory provision at issue here. *Euken ex rel. Euken v. Sec'y of Health & Human Servs.*, 34 F.3d 1045, 1048 (Fed. Cir. 1994). The Federal Circuit did not reach the additional question of whether the deduction of FICA taxes from a petitioner's award for loss of earnings warrants inclusion of the corresponding Social Security retirement income in the award. *Id.* However, in general, special masters have noted that the purpose of an award of lost earnings is to provide the claimant with the stream of income that she has lost due to her injury. *Sarver v. Sec'y of Health & Human Servs.*, No. 07-307V, 2009 WL 8589740, at *10 (Fed. Cl. Spec. Mstr. Nov. 16, 2009) ("The lost wage component replaces the income that the injured party would have earned and then used to support himself (or herself)."); *Jelly v. Sec'y of Health & Human Servs.*, No. 94-646V, 1998 WL 211913, at *5 (Fed. Cl. Spec. Mstr. Apr. 6, 1998) ("[T]he obvious purpose of an award for 'lost earnings' under the Program is to put the petitioner in the same financial situation where she would have been 'but for' the vaccine-caused injury."). Because FICA taxes paid over a person's work-life form the basis of the amount of Social Security retirement income she receives, and because FICA taxes are deducted from loss of earnings awards, it follows that a Vaccine Program claimant's lost Social Security retirement benefits are compensable. To reduce an award of lost earnings by the FICA taxes a claimant would have paid and also decline to compensate for the corresponding lost retirement income would effectively place the claimant in a worse financial position than she would have been in had she not been injured, especially given that the award for loss of earnings is

9

otherwise circumscribed by expected retirement and work-life expectancy as discussed separately above. This would be contrary to the purpose of compensating claimants in order to make them whole. *See* RESTATEMENT (SECOND) OF TORTS § 924 (AM. L. INST. 1979) ("[T]he trier of fact must ascertain, as nearly as can be done in advance, the difference between the earnings that the plaintiff probably would or could have received during his life expectancy but for the harm and the earnings that he will probably be able to receive during the period of his life expectancy as now determined."). In fact, prior to the Federal Circuit's decision in *Euken*, special masters declined to deduct FICA taxes from loss of earnings awards precisely to avoid that outcome. *E.g.*, *Brustuen v. Sec'y of Health & Human Servs.*, No. 90-3936V, 1992 WL 249759, at *1 (Fed. Cl. Spec. Mstr. Sept. 16, 1992) (explaining that "petitioners argue[] it would not be 'appropriate' to subtract F.I.C.A. tax; rather, the amount not subtracted for F.I.C.A. tax could be invested by Ashley to produce, in effect, the equivalent of a retirement pension, thus placing her at least somewhat closer to the economic status of an individual who actually worked productively over a lifetime. I find petitioners' reasoning persuasive, especially in light of the failure of respondent to file any opposition thereto. Thus, at least in this case, I do not find that F.I.C.A. tax is an 'appropriate' tax to deduct in computing the lost earnings award.").

In this case, both parties' premise their lost earnings calculations on the understanding that "the average gross weekly earnings of workers in the private, non-farm sector" is derived from the Current Population Survey ("CPS") compiled by the BLS. (Ex. 79, attachment 1; Ex. J; Tr. 5.) During the damages hearing, petitioners' expert acknowledged that the CPS study does not include benefits in its definition of earnings. (Tr. 5, 31-32; *see also* ECF No. 178, n. 1.) Importantly, however, awards for loss of earnings for minors are *not* coextensive with the "average gross weekly earnings" cited by the statute. The operative language is that awards are made "on the basis of" weekly earnings. Thus, the Court of Federal Claims has previously explained that, by the plain language of the statute, "the wage of a prototypical non-farm worker does not constitute the award amount, but rather serves to provide a basis for calculating the amount to be awarded." *Holihan v. Sec'y of Health & Human Servs.*, 45 Fed. Cl. 201, 206 (1999).[9] It has long been understood in this program that Section 15(a)(3)(B), despite setting forth an overall formulaic approach to lost earnings for a minor, is not entirely self-effectuating. Rather, special masters must incorporate some discretionary fact-finding beyond the explicit text in determining the complete parameters to be applied in calculating the award. *E.g.*, *Childers*, 1999 WL 218893, at

---

[9] *See also Lummi Tribe of the Lummi Rsrv. v. United States*, 112 Fed. Cl. 353, 364 (2013) ("[W]e do not read the phrase 'shall be based on' coupled with a definitive number as necessarily requiring that the number appear unchanged in the final allocation."); *Krueger v. Angelos*, 26 F.4th 212, 217-18 (4th Cir. 2022) ("'Basic' means 'of, relating to, or forming the base or essence,' or 'constituting or serving as the basis or starting point.' 'Basis,' in turn, is defined as 'the bottom of something considered as its foundation,' 'the principal component of something' and even 'something on which something else is established or based.'" (internal citation omitted)); *Beck v. Shinseki*, No. CV 113-126, 2015 WL 1202196, at *26 (S.D. Ga. Mar. 16, 2015) ("'Basis' merely means 'a reason,' 'an underlying fact or condition,' or a 'foundation or starting point.'"); *Sierra Club v. EPA*, 356 F.3d 296, 306 (D.C. Cir. 2004) (noting that the term "based on" is ambiguous and does not require the agency's findings rest solely upon a particular model); *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1111 (9th Cir. 2000) (reasoning that "based on" may be reasonably interpreted as indicating a "starting point" or "foundation").

\*16 (indicating of work-life expectancy that "the statutory formula does not address this issue, so that, in my view, it is a matter left to my discretion, based upon the available evidence" (emphasis omitted)).

In determining that FICA taxes should be deducted from loss of earnings awards for minors pursuant to Section 15(a)(3)(B), the Federal Circuit in *Euken* identified two central points as underlying its analysis that are also relevant to this discussion. First, it concluded that Congress's intent was "to base the award of lost earnings on what workers in the private sector are paid on average." 34 F.3d at 1047. In that regard, the Circuit concluded that FICA is an "appropriate tax" because "workers in the private sector would normally have FICA taxes deducted from their average gross weekly earnings," stressing that FICA affects "the vast majority of workers." *Id.* at 1048. Second, the Circuit explained that the Vaccine Act "specif[ies] an objective standard for determining the net amount of the loss of earnings to be awarded unrelated to what any petitioner might be expected to earn." *Id.* Applying these points to the present issue, if FICA taxes are a reality for the prototypical wage earner as characterized by the Federal Circuit, then so too is Social Security retirement income. And, because we already know it is possible to determine an amount by which to reduce each loss of earnings award for appropriate FICA taxes based on "the average gross weekly earnings of workers in the private, non-farm sector," then it is equally possible to derive a corresponding amount for Social Security retirement income based on the same generic premise. Accordingly, following the analysis in *Euken*, the inclusion of Social Security retirement income in an award for loss of earnings for a minor is fully consistent with the statutory goal of addressing such awards using an "objective standard" based on "what workers in the private sector are paid on average" unrelated to any individual petitioner's own expected earnings. 34 F.3d at 1048.

However, whereas petitioners are persuasive in contending that an award of loss of earnings for Social Security is appropriate, their arguments are not persuasive when applied to other forms of retirement benefits. (ECF No. 178, pp. 10-15.) As discussed above, petitioners concede that retirement benefits are not included in the tracking of the average gross weekly earnings of workers in the private, non-farm sector as complied in the CPS (Tr. 31-32; *see also* ECF No. 178, n. 1), which forms the basis for calculating the award for loss of earnings. Nonetheless, in interpreting Section 15(a)(3)(B), the Federal Circuit found significance in the fact that worker participation in Social Security, and the attendant FICA deductions, affect the "vast majority" of wage earners. *Euken*, 34 F.3d at 1048. Other forms of retirement benefits, however, are not uniform in either their form (for example, 401k matching versus a defined benefit system) or their availability. Many workers do not receive these benefits at all. Moreover, it makes intuitive sense that if FICA and Social Security are factored into the analysis for one purpose (appropriate taxes) they should be considered fully for purposes of determining net loss. Therefore, the argument is much stronger that calculation of a Social Security payout based on the corresponding FICA deduction, which is itself already deducted from the award based on "the average gross weekly earnings of workers in the private, non-farm sector," is consistent with, and a function of, the formula for loss of earnings as set forth in the statute, even though the BLS itself does not track it as part of the CPS.

11

Finally, respondent has not provided any legal citation that supports his interpretation of A.E.'s eligibility for Social Security benefits, leaving his bare assertion that she is entitled to such benefits unsubstantiated. (ECF No. 180, p. 11.)  Even if respondent is potentially correct, any number of factors could affect A.E.'s own eligibility.  As discussed above, however, the Federal Circuit has held that Section 15(a)(3)(B) creates "an objective standard for determining the net amount of the loss of earnings to be awarded" that *precludes* consideration of the vaccinee's own circumstances.  *Euken*, 34 F.3d at 1048.  Thus, the question of what circumstances may ultimately lead A.E. to be eligible for Social Security is beyond the scope of this analysis.  *See also Heinzelman*, 681 F.3d at 1379 (explaining that whether Social Security Disability Insurance is an offset must be determined based on Section 15(g) of the Act, rather than Section 15(a)(3)(A)).

In light of the above, I conclude that petitioners award for A.E.'s loss of earnings shall incorporate anticipated Social Security retirement income.  Such calculation shall be determined in light of the amount appropriately deducted from A.E.'s award for FICA taxes, which is itself derived from "the average gross weekly earnings of workers in the private, non-farm sector," and her work-life expectancy and age of retirement separately addressed within this ruling.[10]  A.E.'s overall life expectancy is to live to age 80.4.[11]  (Ex. O, p. 25.)

---

[10] Notably, petitioners have argued in the alternative that if the statute is interpreted in a manner that precludes an award for Social Security retirement income, then it should be concluded that the award of loss of earnings should not be adjusted downward based on expected retirement and/or work-life expectancy. (ECF No. 181, p. 4 & n.2.)  Petitioners argue in effect that any reasonable interpretation of the Vaccine Act must account for the fact that A.E. (and other similarly situated vaccine-injured children) will need income from which to survive after the date of her otherwise expected retirement.  (*Id.*)  Potentially supporting that view, the language of Section 15(a)(3)(B) includes durational language with respect to "earning capacity" and not "loss of earnings."  And, in that regard, both parties' economists confirm that the concept of "earning capacity" does not account for workforce separation.  (Tr. 47-48; 61-62; 80-82.)  Specifically, the first clause of Section 15(a)(3)(B) requires a determination that the vaccinee is one "whose vaccine-related injury is of sufficient severity to permit reasonable anticipation that such person is likely to suffer impaired earning capacity at age 18 and beyond."  § 300aa-15(a)(3)(B).  The subsequent clause indicates such a person shall receive "compensation after attaining the age of 18 for loss of earnings" which is determined based on "average gross weekly earnings" and without specifying any termination point.  *Id.*  Juxtaposing these clauses, the statute might arguably be interpreted as requiring that A.E. be awarded an amount equivalent to a net weekly wage for however long her vaccine injury is expected to leave her in a state of having an impaired capacity to earn, irrespective of how long statistics would suggest she might have been expected to work.  Consistent with this possible interpretation, legislative history shows that at one point it was anticipated that awards in the program would be monitored by the court and revised as necessary, with an obligation on the part of petitioners to notify the court of any improvement in earning capacity.  H.R. REP. NO. 99-908, at 21 (1986).  In this particular case, because the parties agree A.E. will never be employable, her award of loss of earnings under this interpretation would then be calculated based on her overall life expectancy without accounting for either retirement or work-life expectancy.  However, following this interpretation would suggest that longstanding program practice has been erroneous.  *E.g.*, *Childers*, 1999 WL 218893, at *16.  Additionally, to the extent this would be a somewhat plausible, but presumably more generous, reading of the statute, see n. 8, *supra*.

[11] Petitioners' expert assumes a life expectancy of 79.7 (Ex. 79, p. 2) and respondent's expert assumes a life expectancy of 80.4 (Ex. O, p. 25).  The parties shall use respondent's assumption.

12

### b. Life care planning

Compensation awarded pursuant to the Vaccine Act shall include "reasonable projected unreimbursable expenses," which either "will be for diagnosis and medical or other remedial care determined to be reasonably necessary" or "will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary."  § 300aa-15(a)(1).

(1) <u>Adaptive recreation and certified nurse aid ("CNA") care</u>

In their brief, petitioners' present a conflict between the life care planners with respect to "adaptive recreation."  (ECF No. 178, pp. 19-20.)  In reality, however, there is no conflict with respect to adaptive recreation in itself.  Rather, the parties disagree as to whether the allowance for adaptive recreation should reduce the number of days of CNA "respite care" funded by the life care plan through age 21.  CNA care is distinct from nursing visits.  (Tr. 125.)  It is a form of care whereby an aide is on hand for basic hands-on care, such as bathing.  (*Id.* at 124-25.)  In general, A.E.'s life care plan will provide for up to 12 hours of CNA care per day.  Respite days are days when A.E.'s parents will not be available and therefore a full 24-hours of CNA care is appropriate.

On petitioners' behalf, Ms. Kattman proposed that A.E. receive $1,500.00 per year to accommodate extra support due to her disability when engaging in activities like camps, travel, or recreational classes.  (Ex. 78, p. 28; Tr. 116-17.)  Additionally, she proposes 24 days of respite care.  (Ex. 78, p. 29.)  On respondent's behalf, Ms. Walton agreed with the need for adaptive recreation funds.  (Ex. E, pp. 11-12.)  However, Ms. Walton proposed essentially doubling the amount provided for A.E.'s adaptive recreation to accommodate daily care at a specific annual six-day summer camp, anticipating that A.E.'s time at camp would reduce the overall need for respite care days.  (*Id.*; Tr. 119-20.)  Thus, Ms. Walton agreed to only 18 days of respite care. (Ex. E, p. 14.)

There are two issues with Ms. Walton's approach.  First, Ms. Walton ultimately testified that A.E. may or may not use her adaptive recreation funds specifically for an away camp.  (Tr. 148.)  Ms. Walton explained that although she focused on the cost of a summer camp, the overall point is to ensure funds for adaptive recreaction in whatever form.  (*Id.* at 148-49.)  Second, even if the life care plan did commit A.E. to attending the six-day camp, it is not clear that needed respite care days can be scheduled around the camp.  For example, if Mr. and Ms. Eilan needed to rely on respite care availability due to illness, the timing of such illness could not be anticipated.

Ultimately, Ms. Walton declined to take a position with respect to whether 24 days of respite care per year is appropriate for A.E.'s own circumstances.  Instead, she testified that "I'm not saying it's right or wrong, but it's more than I typically see proposed.  So 18 days of 24-hour respite is a lot."  (Tr. 149-50.)  However, given the

extent of A.E.'s physical limitations, the suggestion of what it *typical* is not necessarily informative of what is appropriate for A.E. and her family. Because Ms. Walton presented her opinion regarding respite care with the assumption that A.E. would utilize an away camp, it is not actually clear on this record whether Ms. Walton opines 18 days of respite care is enough for A.E. and her family, even though she opines that, as a general matter, it is "a lot." In fact, in discussing whether A.E. might not ultimately attend an away camp, or may not do so when she is older, Ms. Walton appeared to suggest that the amount of respite care should be increased under those scenarios. (*Id.* at 149.)

Accordingly, A.E.'s life care plan shall include $1,500.00 per year for adaptive recreation as proposed by petitioners and, balancing Ms. Kattman's and Ms. Walton's opinions and considering the record as a whole, I conclude that A.E.'s life care plan should account for 24 days per year of CNA respite care through age 21 as proposed by petitioners.

(2) Cost of certified nurse aid ("CNA") care

The parties also disagree with respect to the hourly rate at which A.E.'s CNA care will be funded in the life care plan. Ms. Kattman cites an hourly rate of $33.50 for CNA care. (Ex. 78, p. 29.) She explained that she contacted several agencies in the relevant area, eliminated the highest and lowest rates as outliers, and averaged the remaining rates, which ranged from $32.00 to $35.00 per hour. (Tr. 123.) Ms. Walton contacted one national provider, Bayada Health, and was quoted a rate of between $31.00 and $32.00 per hour for pediatric care and $27.00 for adult care. (Ex. E, p. 14; Tr. 147-48, 155.)

Ms. Kattman testified that it is important to look at average costs because the agency that currently has the lowest available rate may either raise that rate or may not stay in business over the longer term. Accordingly, in order to ensure the life care plan remains implementable over time, the service must be costed at a reasonable overall average. (Tr. 124.) Ms. Kattman represents that, when determining someone's needs throughout a lifetime, it is a tenet of life care planning as published by the International Academy of Life Care Planners, that costs are assessed from multiple sources to ensure portability of care over time. (*Id.* at 106-07.) Apart from therapy services at Good Shepherd, which are addressed separately below, Ms. Walton did not dispute Ms. Kattman's description of the appropriate methodology. She only testified that, in contacting Bayada, she was not seeking-out the lowest rate and was surprised Bayada turned out to have the lowest rate. (*Id.* at 147.) However, this does not answer the concern raised by Ms. Kattman and the petitioners.

Accordingly, A.E.'s life care plan shall provide for CNA care at an hourly rate of $33.50 as proposed by petitioners.

14

(3) <u>Cost of out-of-pocket therapies</u>

The parties have agreed that A.E. will be provided private medical insurance through the age of 21, when she will then be eligible for Medicare. However, the agreed-upon insurance plan will cover only 60 sessions of physical therapy, 60 sessions of speech therapy, and 48 sessions of occupational therapy per year, whereas it is undisputed that A.E. should have 66 sessions of each per year. (Ex. E, pp. 9-10.) The parties agree that A.E.'s life care plan should include funds to cover the out-of-pocket expense of these additional therapy sessions; however, they disagree as to the amount.

Consistent with the methodology discussed in the preceding section relative to CNA rates, Ms. Kattman determined that, based on averaging, appropriate rates for life care planning purposes are $462.00 per hour for physical therapy, $468.00 per hour for occupational therapy, and $450.00 per hour for speech therapy, though these rates are actually lower than what Ms. Kattman determined is the rate for these services at Good Shepherd, where A.E. currently goes for therapy. (Ex. 78, pp. 25-28; Tr. 108-13.)

The life care planners have confirmed that Good Shepherd will continue to be available to A.E. once she begins coverage with the health insurance plan that has been selected (Tr. 108-09), and Ms. Eilan testified during the hearing that "Good Shepherd is like our second home. We have been with Good Shepherd since day one, years, and we know all the people, all the therapists, all the doctors." (*Id.* at 159-60.) She indicated that petitioners "definitely" wish to continue A.E.'s services at Good Shepherd. (*Id.*) Because of this, and because the issue is present only for a finite period in the nearer term future (until A.E. turns 21 in about eight years, rather than the course of her entire life), the portability issue discussed by Ms. Kattman relative to CNA care is less weighty. Further, Ms. Walton explained that Good Shepherd is an established and reputable provider, suggesting it can be reasonably relied upon to have a permanent presence. (*Id.* at 144-45.) Because it is reasonably anticipated that A.E. will complete most of her yearly therapy at Good Shepard under her insurance coverage, Ms. Kattman agreed that the primary consideration is the cost of therapy at Good Shepherd itself, so that continuity of care can be maintained. (*Id.* at 109-10 (agreeing that the cost of Good Shepherd services "loom[s] large" in the analysis).)

According to Ms. Kattman, Good Shepard charges $524 per hour (or $131 per 15 minutes) for these services. (Tr. 110.) However, when Ms. Walton examined the rates at the Good Shepherd facility on respondent's behalf, she determined that the current cash rate for out-of-pocket payment is $130 per hour for physical and occupational therapy. (Ex. E, pp. 9-10.) Ms. Walton explained that this discrepancy is due to the fact that it is common practice for providers to charge individual out-of-pocket payers the equivalent of what they would receive as reimbursement from Medicaid and private insurers. (Tr. 144.) Ms. Kattman did not dispute this understanding, but asserted that the "going" market rate should still be used. (*Id.* at 107.) Moreover, Ms. Kattman indicated that Good Shepherd did not confirm the same price to her when she contacted them. (*Id.* at 111.) Given that the life care planners had received different information

15

when separately contacting Good Shepherd, I directed the life care planners to contact the facility jointly.  (ECF No. 173.)

Subsequent to the damages hearing, the parties' life care planners had a joint call with a financial services representative and a legal representative for Good Shepherd.  Ms. Kattman prepared a summary memorandum of the conversation that was signed by both representatives and has been filed as Exhibit 86.  Based on that memorandum, the representatives confirmed that

> Good Shephard Rehabilitation Hospital currently has a cash (or private pay) price for those who do not have insurance or have exhausted insurance benefits.  Good Shepherd Rehabilitation Hospital offers a private pay rate of $32.50 per 15 minute unit ($130 per hour) for physical therapy and occupational therapy and $97.50 per unit (a full session) for speech therapy.

(Ex. 86, p. 1.)  They indicate that this policy has been in place for at least six years, but caution that "there is no guarantee that the Good Shepherd Rehabilitation Hospital private pay/self pay policy will not change over time or that it will continue to be available over time."  (*Id.*)

Petitioners have also filed a consensus statement from the Journal of Life Care Planning.  (Ex. 87.)  That document indicates that best practices for assessing costs in a life care plan include, in pertinent part, using "[n]on-discounted/market rate prices" and that "[m]ore than one cost estimate, when appropriate," should be used.  (*Id.* at 4.)  However, I do not agree that the private pay rate initially identified by Ms. Walton and confirmed in the subsequent memorandum violates these practices.  First, I do not agree that the private pay rate at issue constitutes a discounted rate in the sense of being any type of fleeting "sale" price.  Although it clearly reflects a tiered price structure, it is a market rate in that it is widely available on an ongoing basis to anyone who is paying out-of-pocket due to having exhausted insurance coverage, which will necessarily include petitioners, and it has been in place for six years.  Second, as discussed above, Ms. Eilan's interest in maintaining continuity of care is a circumstance that supports utilizing only one cost estimate.  Although Good Shepherd is not guaranteeing the quoted rates, this is not necessarily an unexpected or unreasonable caveat.  Price guarantees are generally not otherwise a feature of the life care planning in this case.  Nothing in the life care planners' follow up with Good Shepherd suggests any particular reason to anticipate that the rates will change significantly or that the tiered pricing will be abandoned.  On the whole, it is far more likely than not that petitioners will actually pay the prices quoted in the memorandum at Exhibit 86 for A.E.'s therapies, rather than the otherwise publicized rates identified by Ms. Kattman.

In light of the above, A.E.'s life care plan shall include funds for A.E.'s anticipated out-of-pocket costs for physical and occupational therapy at Good Shepard at a rate of $130 per hour and speech therapy at a rate of $97.50 per session.

(4) <u>Tutoring</u>

Petitioners request funding for weekly tutoring as reasonable and necessary. (ECF No. 178, pp. 20-21.) In that regard, petitioners' life care planner consulted with A.E.'s primary teacher, who suggested that A.E. might benefit from a reading tutor because her parents "expected a lot from her academically." (Tr. 120-21.) During the hearing, however, Ms. Eilan explained that A.E. has an appropriate IEP in place. (*Id.* at 94.) She attends regular math, science, and social studies courses, but has special education classes for grammar, writing, and reading. (*Id.* at 95.) She is behind in these latter subjects primarily because of her physical limitations, which affect her ability to write and vocalize. (*Id.*) Apart from taking longer and fatiguing, A.E. does well in school, primarily achieving A and B-plus grades. (*Id.*) A.E. does need a lot of help with her homework, which petitioners currently provide. (*Id.* at 96.) However, her primary issue is physical fatigue, rather than any intellectual deficit. (*Id.* at 95-96.) Because A.E.'s issues with homework are primarily physical, respondent's life care planner reasonably concludes that what A.E. could benefit from is a scribe, rather than a tutor. (*Id.* at 145-47.) In that regard, she notes that assisting A.E. with her writing would be an appropriate function for the attendant care provider that A.E. will otherwise have access to once her life care plan is in place. (*Id.*) Thus, separate tutoring is unlikely to be helpful in resolving A.E.'s particular needs, which relate to physical fatigue.

Accordingly, tutoring is not reasonably necessary.

(5) <u>Residential care facility</u>

Respondent proposes that A.E. be provided live-in care and skilled nursing in-home only until she reaches the age of 60, or until 2070. (ECF No. 180, p. 5 (citing Ex. E, p. 16).) Respondent argues that, by that point, her parents will be 90 and 107 years old, respectively, and A.E. will likely require additional care in the form of assisted-living. From that point forward, respondent proposes to supplement facility care with additional, daily, private certified nursing assistant care. (*Id.*) Absent this proposal, respondent's life care planner confirmed during the hearing that she would otherwise propose to continue for the remainder of A.E.'s life the same level of care A.E. received prior to age 60. (Tr. 154.)

Respondent acknowledges that Section 15(c) of the Vaccine Act requires that a petitioner be awarded sufficient compensation "to remain living at home." (ECF No. 180, p. 5 (quoting § 300aa-15(c)).) However, he contends in effect that this provision is not without reasonable limitation. Respondent quotes the following from a 1990 decision by then Chief Special Master Golkiewicz:

> The statutory provision for home-based care must be given a reasonable construction. It would not be reasonable or in [petitioner's] best interest to provide for home-based care when his parents are aged – or deceased – and no longer able to care for him. Further, there is no assurance that the parental home will be available for [petitioner] after they are gone. The

17

> statutory mandate that compensation be sufficient to allow the compensated person to remain living at "home" simply does not mean that he should remain in the family dwelling after the family setting no longer exists. A house is not a home. A home is more than a dwelling place, especially for a person like [petitioner] who depends totally on others for every aspect of his life and care.

(*Id.* at 5-6 (quoting *Crossett v. Sec'y of Health & Human Servs.*, No. 89-73V, 1990 WL 608690, at *5 (Fed. Cl. Spec. Mstr. May 4, 1990) (alterations in original)).) Respondent also cites two other cases as being consistent with *Crossett*. (*Id.* at 6 (citing *Alger ex rel. Alger v. Sec'y of Health & Human Servs.*, No. 89-31V, 1990 WL 293408 (Fed. Cl. Spec. Mstr. Mar. 14 1990); *Shaw v. Sec'y of Health & Human Servs.*, 19 Cl. Ct. 334 (1990)).)

Petitioners argue, however, that respondent's proposal violates the Vaccine Act. (ECF No. 178, pp. 21-22.) Petitioners explain that the Vaccine Act requires that "[t]he amount of any compensation for residential or custodial care and service expenses under subsection (a)(1) of this section shall be sufficient to enable the compensated person to remain living at home." (*Id.* (alteration in original) (quoting § 300aa-15(c)).) They contend that this language is clear and unambiguous. (*Id.* at 22.) Petitioners cite a far more recent decision in which a different special master concluded that the statutory language permits the type of award petitioners seek in this case, namely in-home nursing care for the entirety of a child's remaining life. (*Id.* (citing *Lerwick v. Sec'y of Health & Human Servs.*, No. 06-847V, 2014 WL 3720309, at *14-16 (Fed. Cl. Spec. Mstr. June 30, 2014)).) Petitioners stress that while A.E. has physical disabilities, she is "intellectually bright and social." (*Id.* at 23.) Thus, they argue that being placed in a facility is not in her best interest. (*Id.*)

In *Lerwick*, the special master observed that this issue presents a question of statutory interpretation, which must begin with the plain language of the text. 2014 WL 3720309, at *14 (citing *Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, 1330 (Fed. Cir. 2011) (en banc)). Examining the language of Section 15(c) of the statute, the *Lerwick* special master concluded that the language at issue is "straightforward" and therefore "conclusive." *Id.* (quoting *Schindler v. Sec'y of Health & Human Servs.*, 29 F.3d 607, 611 (Fed. Cir. 1994)). I agree. As the *Lerwick* special master further observed, whatever the potential wisdom in respondent's approach to A.E.'s future care, the argument that Section 15(c) applies only so long as capable, caring parents are present adds a qualification that is not within the statute, and judicial officers should not add words to a statute.[12] *Id.* (citing *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1356 (Fed. Cir. 2008); *Adam Sommerrock Holzbau, GmbH v. United States*, 866 F.2d 427, 429 (Fed. Cir. 1989)).

In *Crossett*, the Chief Special Master initially noted that Section 15(c) of the Vaccine Act "appears to be self-explanatory." 1990 WL 608690, at *5. However, the

---

[12] The *Lerwick* special master considered further arguments by respondent relating to legislative history; however, those arguments have not been presented in this case. But in any event, because I conclude the plain language of the statute resolves the issue, it is not necessary to reach any further arguments.

complicating factor that affected his "reasonable construction" of the outer bounds of this provision was the fact that the injured vaccinee had a significant enough brain injury that once she outlived her parental caretaker she "will in essence require surrogate parents." *Id.* (quoting *Alger*, 1990 WL 293408, at *16-17). In that context, the special master focused on the impracticalities of providing in-home care to someone without any anticipated familial caretaker and without the cognitive ability to look after their own interests, noting, for example, that there is no assurance the familial house will remain available. The special master further concluded that the emotional connection of "home" would dissipate after the parental caretaker's death, suggesting this should affect the balancing of the practical considerations. The reasoning in *Alger* and *Shaw* is the same. *Alger*, 1990 WL 293408, at *10; *Shaw*, 19 Cl. Ct. at 341. As alluded to in the later *Lerwick* decision, 2014 WL 3720309, at *13, this interpretation may find some additional support in Section 15(a)(1)(A)(iii)(I) of the Act, which requires special masters to determine what projected expenses are "reasonably necessary."

Ultimately, however, it is not necessary to resolve whether an outcome such as that in *Crossett*, *Alger*, and *Shaw* is ever appropriate. These prior cases reflect a more difficult scenario that is not present in this case. Because A.E.'s disability is physical, rather than cognitive, if given appropriate resources to manage her physical care, she will have the capacity as an adult to engage in decision-making about her care and her housing that will permit her to manage the practical consequences of remaining housed in whatever abode she at that time considers home. Even assuming that the plain language of the statute supports the "reasonable construction" applied by *Crossett*, *Alger*, and *Shaw*, nothing on this record supports the proposition that awarding A.E. sufficient funds to afford at-home care for her entire lifetime as patently required by the Act would fall beyond what is otherwise reasonable.

My finding is that A.E.'s life care plan must be sufficiently funded so that she can live "at home," in whatever abode she maintains as an adult, for the entirety of her life. Respondent's proposal that A.E.'s life care plan be funded based on the assumption that A.E. will enter some form of residential care facility at age 60 cannot be imposed upon petitioners over their objection.

## IV. Conclusion

For the reasons discussed above, the questions posed by the parties are answered as follows:

- **A.E.'s loss of earnings shall be calculated based on an anticipated retirement age of 65.05.**

- **A.E.'s loss of earnings shall be calculated based on a work-life expectancy of 38 years.**

- **A.E.'s loss of earnings shall include an amount for social security retirement income calculated based on the amount to otherwise be deducted from her award for FICA taxes, which is itself derived from**

19

> **"the average gross weekly earnings of workers in the private, non-farm sector," a work-life expectancy of 38 years, a retirement age of 65.05, and an overall life expectancy of 80.4 years; however, the award shall not include any other form of retirement income.**
>
> - **A.E.'s life care plan shall include $1,500.00 per year for adaptive recreation and 24 days of 24-hour CNA respite care through age 21 as proposed by petitioners.**
>
> - **A.E.'s life care plan shall be funded based on an hourly rate for CNA care of $33.50 per hour.**
>
> - **A.E.'s life care plan shall include an amount sufficient to pay out-of-pocket for recommended physical, occupational, and speech therapies at Good Shepherd Rehabilitation Hospital in excess of A.E.'s insurance coverage through age 21 at a rate of $130 per hour for physical and occupational therapies and $97.50 per session for speech therapy.**
>
> - **Funding for tutoring is not reasonably necessary.**
>
> - **A.E.'s life care plan shall include sufficient funding for A.E. to remain "at home" for the entirety of her life.**

The findings in this ruling are limited to what is summarized in bold above. The parties shall continue to work collaboratively to resolve any remaining issues regarding the form or scope of the award and to complete the additional calculations necessary to generate a proffer on award of damages that incorporates the findings made herein. If any additional issues arise, or if the parties find that any issue has been left inadvertently unaddressed, they shall inform the undersigned as soon as practicable. A separate scheduling order will be issued.

**IT IS SO ORDERED.**

<u>s/Daniel T. Horner</u>
Daniel T. Horner
Special Master
